METROPOLITAN COAL COMPANY *vs.* BOUTELL TRANSPORTATION AND TOWING COMPANY.

Suffolk.    March 21, 1907. — June 19, 1907.

Present: KNOWLTON, C. J., MORTON, LORING, SHELDON, & RUGG, JJ.

*Agency,* Scope of authority, Ratification. *Contract,* What constitutes. *Estoppel.* *Practice, Civil,* Different positions at successive trials. *Damages.*

At the trial before a judge without a jury of an action for breach of an alleged agreement to charter vessels, there was evidence tending to show that the defendant, in a letter to a shipbroker, offered to furnish certain vessels and that the broker transmitted the offer to the plaintiff, that the plaintiff wrote to the broker a letter which he intended for an acceptance of the offer, but which, through inadvertence on his part, varied from the terms of the offer, that the plaintiff also orally told the broker that he accepted the offer, that the broker wrote the defendant a letter stating that the plaintiff accepted the offer in terms, and that subsequently the plaintiff ratified the broker's action. The presiding judge refused to rule in accordance with a request of the defendant that the letter of acceptance of the broker to the defendant exceeded the authority given in the letter of the plaintiff to the broker, and that therefore there was no valid acceptance of the offer by the plaintiff. *Held,* that such refusal to rule was right, as the presiding judge properly might have found that the broker's letter of acceptance was authorized orally and was ratified by the plaintiff.

At the trial before a judge without a jury of an action for breach of an alleged agreement to charter vessels, there was evidence tending to show that the defendant offered in a letter to a shipbroker to "furnish" certain vessels, and that the broker transmitted the offer to the plaintiff, that the plaintiff wrote to the broker a letter which he intended to be an acceptance of the offer, but which, through his inadvertence, varied from the terms of the offer, that the plaintiff also orally told the broker that he accepted the offer, that the broker wrote the defendant a letter stating that the plaintiff accepted the offer in terms, and that subsequently the plaintiff ratified the broker's action. *Held,* that the evidence warranted a finding that there was a valid acceptance by the plaintiff of the offer of the defendant, the plaintiff's unsuccessful attempt to accept the offer in writing not precluding him from an oral acceptance through the broker.

An offer in writing to a broker to " furnish four or five barges that will insure cargoes at a satisfactory rate and carry not less than 8000 tons of coal and a first class tug boat of not less than 1000 H. P. to tow these or other barges, . . . to carry coal . . . beginning before November 1 and continuing until May 1," was *held* to have been accepted by an authorized letter from the broker stating " Your offer . . . to furnish four or five barges and a tug to transport not less than 8000 tons of coal . . . from November 1 or earlier to May 1 has been accepted."

At the first trial of an action for breach of an alleged agreement to furnish to the plaintiff certain barges and a tug, the plaintiff, to establish the contract, relied upon an offer contained in a letter of the defendant to a shipbroker and communicated to the plaintiff, an intended acceptance contained in a letter from him to the broker, and evidence tending to establish that certain variations from the terms of the offer contained in the letter intended for an acceptance were waived by the defendant. On exceptions of the defendant after a finding for the plaintiff, this court held that the variations in the letter intended as an acceptance rendered it inoperative as such and that there was no waiver by the defendant of the right to object to the variation as rendering the acceptance inoperative. At a second trial, the plaintiff introduced evidence tending to establish that, at the time he handed to the broker the letter which was intended by him to be, but had been adjudged by this court not to be an acceptance of the defendant's offer, he orally had communicated his acceptance to the broker, and that the broker had written to the defendant a valid acceptance. *Held*, that the position taken by the plaintiff at the first trial did not estop him from taking the one he took at the second trial, the two not being inconsistent.

In an action for breach of an alleged agreement of the defendant, an Ohio corporation, to furnish certain vessels to the plaintiff for use in carrying coal between certain ports on the Atlantic coast, the plaintiff relied upon an offer in writing beginning " We will agree," and signed " M., Manager," and the defendant contended that M. did not intend to and was not authorized to make such an offer on its behalf. There was evidence tending to show that the defendant by its corporate charter had power to acquire, own and operate tugs and other vessel property, that M. was its general manager with an office in Boston in which the offer was signed by him, and was empowered under the by-laws of the defendant to " conduct the business operations of the company as its business representative in all respects subject to the control of the board of directors," that, when signing the offer, he did not state that he was not acting for the defendant and that, immediately after acceptance of the offer, he went to the home office of the corporation in regard to the matter, that he sought to procure from one of the officers of the defendant the refusal of a vessel owned by him which might be fitted to the purposes of the alleged agreement, and, in conversations and in correspondence written on business stationery of the defendant with regard to procuring such vessel, he discussed other matters relating to the business of the defendant. The defendant relied on evidence tending in part to controvert the foregoing, and also on evidence tending to show that the defendant did not own vessels which could be used to carry out the terms of the offer signed by M., and had not in its business used any but its own vessels, that M., at the time of signing the offer, had been and was " manager " for various craft on the Great Lakes in the sense that he had been accustomed to make agreements for chartering them and in so doing had not acted for the defendant, and that the broker knew that the word " manager " commonly was used in shipping circles to mean one actively in charge of a vessel. *Held*, that there was evidence warranting

a finding that M. signed the offer with ostensible authority and with intention to bind the defendant.

An action for breach of an agreement, made by the defendant on September 28, to furnish to the plaintiff, a wholesale and retail dealer in coal, barges and a tug for transportation of its coal for a period beginning before November 1 and ending May 1, which was repudiated by the defendant on October 7, was referred to an assessor for assessment of damages, who found, on evidence warranting his findings, that the coal intended to be transported in the vessels which the defendant had agreed to furnish was but a part of that brought by the plaintiff to its wharves, that, neither on October 7 nor up to May 1, were barges and a tug to be procured on terms such as those agreed upon between the plaintiff and the defendant at any price that fairly could be called a market price, or which the plaintiff could pay wisely or properly, nor were sailing vessels to be had on such terms at prices proper for the plaintiff to pay, and that, acting reasonably, the plaintiff chartered, from time to time according to its needs and on the best terms procurable, vessels of various sizes and sorts for its purposes specified in the agreement. He then found the difference per ton between the sum paid by the plaintiff for transportation of coal under such arrangement and the sum that he would have paid under the agreement sued on, which difference he multiplied by the number of tons which he found that the plaintiff could have carried under the agreement sued on. The resultant sum he assessed as damages. *Held*, that the rule adopted by the assessor was proper, and that he was not required to adopt a rule contended for by the defendant which was based on an assumption that the plaintiff might have acted differently, he having found that the plaintiff acted reasonably.

CONTRACT for breach of an alleged agreement for the charter of a tug and coal barges. Writ dated December 26, 1899.

The case first was tried before *Mason*, C. J., without a jury, on a declaration alleging that the defendant made the following offer to the plaintiff: " Boston, Sept. 26th, 1899. To Mess. Walter, Friend & Co., Boston, Mass. Dear Sirs: We will agree to furnish four or five barges that will insure cargoes at a satisfactory rate and carry not less than 8000 tons of coal and a first class tug-boat of not less than 1000 H. P. to tow these or other barges, our option of substituting one or more barges for others, without inconvenience to charterers, to carry coal from New York, Philadelphia, Newport News, Norfolk or Baltimore to Boston beginning before November 1st, and continuing until May 1st, 1900. The price per day for the above tug and barges to be $225. to be divided proportionally, charterers to load, trim and discharge all cargoes and furnish the tug with bunker coal at their expense. Tug to be at all times at the service of charterers to do whatever towing they may require, in addition to towing the above barges. Very truly yours, Wm. H. Mack,

Mgr.   Above offer is good until Thursday noon "; and that the plaintiff accepted the offer in the following letter: "Boston, Mass., September 28, 1899.   Messrs. Walter, Friend & Co., 129 State Street, Boston, Mass.   Dear Sirs: We, herewith, accept your offer to furnish us with four (4) or five (5) barges that will insure cargoes at satisfactory rate, and carry not less than eight thousand (8000) tons of coal; and also a first class tow-boat of not less than one thousand (1000) horse power, to carry coal for us from November 1st, 1899 to May 1st, 1900 from New York, Philadelphia, Newport News, Norfolk and Baltimore to Boston. All the above as per conditions and terms named in option to you from W. H. Mack, Manager, dated September 26th, 1899. The above to be subject to usual conditions of charter.   Yours truly, Metropolitan Coal Co., by Edward Hamlin, President." The presiding judge found for the plaintiff and exceptions by the defendant were sustained by this court in a decision reported 185 Mass. 391.

After the rescript sustaining the defendant's exceptions, the plaintiff amended the declaration by substituting, in place of the letter relied on in the original declaration as an acceptance of the defendant's offer, the following letter: "Boston, Sept. 28th, 1899.  William H. Mack, Manager, Boston, Mass.   Dear Sir: Your offer made to us to furnish four or five barges and a tug to transport not less than 8000 tons of coal from New York to Norfolk, Newport News and Baltimore to Boston from November 1st or earlier to May 1st, has been accepted by the Metropolitan Coal Co., to whom we made the offer in accordance with your offer to us at $225. per day, they to load, trim and discharge cargoes and furnish and pay for Bunker coal for the tug.   Very truly yours, Walter, Friend & Co."

There was a second trial before *Gaskill,* J., without a jury.

Walter, Friend and Company were ship brokers engaged in business in Boston, Massachusetts.   The Metropolitan Coal Company was a corporation located at Boston, Massachusetts, engaged in the buying and selling of coal.

The Boutell Transportation and Towing Company was a corporation organized under the laws of the State of Ohio in May, 1899.   William H. Becker was president, John Mitchell, treasurer, and they, together with William H. Mack, Benjamin

Boutell, and three others, directors. The tugs Sweepstakes and Peter Smith were purchased from Benjamin Boutell. The charter of the corporation stated that it was " formed for the purpose of acquiring, owning and operating . steamships, vessels, tugs and other vessel property; constructing, acquiring and owning docks and such other terminal property, real and personal, and machinery and equipments as may be necessary or . useful in connection with the operation of its vessels and vessel property; and for the purpose of doing all such other things as may be properly incident to the carrying on of the above enumerated purposes." The by-laws of the corporation provided : " The general manager shall have charge of all business and property of the company and shall conduct the business operations of the company as its business representative in all respects subject to the control of the board of directors." On May 20, 1899, Mack was elected general manager.

The operations of the defendant were carried on solely with the tugs mentioned above, and it never owned or operated a tug of one thousand horse power.

On September 22, 1899, Mack, as general manager of the defendant, made an oral agreement with the Davis Coal and Coke Company, previously authorized by the defendant's directors, which was reduced to writing and signed by him on September 25, he using the signature " Boutelle Towing & Transportation Co., Wm. H. Mack, Gen. Mgr." This contract gave the defendant the right to " apply on " it any of the barges it owned (naming them), at its option.

About the middle of September, 1899, Arthur P. Friend of the firm of Walter, Friend and Company, was asked by Eugene Nelson, sales agent of the plaintiff in charge, with its president, Edward Hamlin, of the chartering of vessels to use in its business, to procure vessels for the winter's work, and, having had a card of Mack's which stated that he was general manager of the defendant, interviewed Mack.

From the testimony of Friend, a witness for the plaintiff, the following facts appear: Friend had a conversation with Mack on September 26, 1899, and told him he was seeking to charter vessels for the plaintiff. Mack made an offer which Friend then reduced to writing on one of his own letter heads and sub-

mitted to Mack.  This is the letter dated September 26 from Mack to Walter, Friend and Company, set out above, excepting the sentence following the signature.  Mack desired a time limit to be put on the offer and had his own typewriter write upon the letter the words " Above offer is good until Thursday noon," and then signed it as appears above.  The letter in its final form was delivered at once by Friend to the plaintiff. Friend did not recollect any mention of a tug Traveller in his conversations with Mack.  On September 27 or 28, the latter date being the " Thursday " mentioned in the letter of offer, Friend prepared drafts of two charter parties at the request of both Hamlin and Mack, which carried out the terms of the letter of September 26, and which he showed first to Mack who suggested that he show them to Hamlin.  He showed them to Hamlin, who said " That is all right," and then he returned them to Mack and left them with him.

These drafts of charter parties were in evidence.  Both were dated September 27, 1899.  One named " Wm. H. Mack Manger of the First class Tug——," as party of the first part, and the other named " Wm. H. Mack, Manager of certain barges carrying about 8000 tons of coal, that are insurable at satisfactory rates," as party of the first part.  The names of the tug in the first charter party, and of the party of the second part in both the first and second were not written in.

On the morning of September 28, while at Mack's office, Friend was summoned by telephone to the office of the plaintiff. Arriving there, he was interviewed by Hamlin, who delivered to him the letter set forth above, dated September 28, 1899, directed to Walter, Friend and Company and signed in the name of the plaintiff.  This letter never was shown to Mack. Friend then went to his office and wrote to Mack his firm's letter, set forth above, dated September 28, 1899, and delivered it to Mack before noon.

Friend never showed Hamlin a copy of this latter letter, but on his way back from Mack's office he stepped in to the plaintiff's office and told Hamlin that he had accepted the offer and would bring in the charter parties " filled in properly " a little later.  He went to Mack's office after lunch and was asked by him to come to his office in the afternoon and he would execute

the charter parties, but, in the afternoon, Mack did not exe-
cute the charter parties, saying he was waiting to hear from
Cleveland.

On October 7 Friend received a telegram from Cleveland,
Ohio, signed "Wm. H. Mack," and reading "Consider deal off.
Will be in my office Monday," which he showed to Hamlin and
then replied to with a telegram reading "Metropolitan Coal Co.
have signed charter for second tug to assist towing your barges
and will not release you," to which Mack replied from Cleve-
land, Ohio, "Charter with you was conditioned on my being able
to get tug and barges from here down, which cannot do. Will
be in my office on Monday."

Friend further testified that he was familiar with vessels and
familiar with what were called managers of vessels; that, when
the word "manager" was used in relation to a vessel or vessels, he
understood that that meant the managing owner of the vessel;
that that was generally well known in the shipping trade; that
the word "manager" in relation to vessels was very common;
that it was understood to be the person who looks after the shore
business of the vessel, the entire business so far as he could out-
side of the sailing part, with authority to buy materials to go on
board, to instruct the captains what to do, and to sign a charter
party as manager, and that that was generally understood in the
shipping business.

He also testified that a commission on the transaction was to
be paid to him by Mack and not by the plaintiff, that this was
talked over at some interview, he presumed the first interview,
with Mack.

Other testimony in part corroborating that of Friend was
given by Nelson and Hamlin, the latter testifying also that on
September 28 Friend communicated with him after he had given
Friend the plaintiff's letter purporting to accept the defendant's
offer, and had said the offer was accepted, and that he himself
had intended to accept the offer by the letter he had given
Friend that day.

Mack died before the first trial of the case.

Evidence introduced on behalf of the defendant tended to
show that Mack was not in Boston on September 28, 1899. Evi-
dence of conversations of Mack with various persons was intro-

duced and tended to show that Mack had stated that the letter containing the alleged offer was not made on behalf of the defendant, but of himself personally, that it was delivered to Friend on the condition that it was not to be used by him until he, Mack, found out whether he could get the vessels, he having told Friend that the defendant's entire fleet was under charter to the Davis Coal and Coke Company.

Further evidence was introduced by the defendant tending to show that Mack, in August and September, 1899, was seeking to charter vessels then on the Great Lakes for use in the Atlantic coast trade; that, among others, he telegraphed to and interviewed one Boutell, vice-president of the defendant, especially with regard to immediate action in sending East the Peter Smith, a tug of the defendant mentioned above, which was being fitted for sea work, and the Traveller, a tug of one thousand horse power, owned by Boutell, and that he wrote him a letter on stationery of the defendant, dated September 27, 1899, containing the following: "I telegraphed you yesterday morning that I thought it advisable for you to fit out the 'Traveler' and send her down here. If you can fit her out and get her down here by November I can charter her outright for you with a guaranteed contract for $100.00 per day. I think there is lots of business to be had, and I am afraid that this company is going to lose lots of good business by the awful delay in getting the 'Smith' down here. Certainly something radically strong in the way of an effort should be made to hustle this work up. And I think that I will ask you to have the 'Smith' all ready to inspect next Monday morning, Oct. 2d. . . . In regard to the 'Traveler' again. I would advise you to put her into the dry dock and trennel her. . . . By doing some good hustling I should think this work could be done in a week, . . . and that in one month after commencing the work you can have the 'Traveler' in Boston. It was exactly one month to the day from the time that we received the 'Sweepstakes' in Cleveland until we arrived in Bath. But we hustled. You can talk with Capt. McCarthy [who was in the defendant's employ] and see what his idea is about having the tug down here in addition to the two belonging to the Company. And I think I can make you some money if I had the two Barges down here as there is an

awful demand for Barges. Everyone is after Barges. And we can get almost any price for carrying coal."

Other facts on the question of liability are stated in the opinion.

At the close of the evidence, the defendant made the following requests for rulings which the presiding judge refused to give, and the defendant excepted:

1. That on all the evidence no contract has been established between the plaintiff and the defendant in manner and form as declared on and the plaintiff cannot recover in this action.

2. That the plaintiff having, prior to the amendment of its declaration in this action, brought suit upon its letter of September 28 as its acceptance, and having relied in the trial of said action on said letter and on proof of a waiver of the variation between Mack's offer and said acceptance, is bound by its election to stand on said letter constituting in law a rejection of Mack's original offer and cannot stand on Friend's letter of September 28 as its acceptance of said offer.

3. That Friend's letter of September 28 does not constitute in law a sufficient acceptance in behalf of the plaintiff of the offer declared on.

4. That Friend's letter of September 28 is not in the same terms as the offer declared on and does not constitute a valid acceptance thereof.

5. That on the evidence Friend's relation to Mack and the defendant, if the defendant was Mack's principal in the transaction, was such that he owed a duty to Mack and the defendant to correctly transmit any acceptance which he had received from the plaintiff, and that he was thereby precluded from acting in behalf of the plaintiff in any incorrect transmission of its acceptance. [To this ruling the presiding judge said, subject to the defendant's exception, " Yes, as a general proposition, and I apply it to the facts found by me."]

6. That, if the letter of Friend of September 28 met in terms the offer for a service to begin before November 1, it did not correctly transmit the acceptance of the plaintiff of September 28, and the plaintiff is precluded from availing itself of said letter of Friend as its acceptance by reason of the duty of said Friend to Mack and the defendant to correctly transmit the plaintiff's ac-

ceptance.    [To this request the presiding judge answered, subject to exception by the defendant, "Yes as to the letter of the plaintiff of September 28, but on the facts found I do not regard the latter part, beginning with the words 'and the plaintiff is precluded,' applicable."]

7. That the plaintiff, having finally reduced to writing in its letter of September 28 to Friend his authority to act for it, Friend's authority to accept in the plaintiff's behalf was limited to the terms of that letter.    [To this ruling the presiding judge said, subject to exception by the defendant, "No, under facts found."]

8. That the evidence would not warrant a finding that the plaintiff knew that Friend had accepted the offer of Mack, other than by and in accordance with the terms of its letter of acceptance of September 28.

9. That the evidence disclosed no such knowledge on the part of the plaintiff of the terms of Friend's letter as to constitute a ratification of that letter as an acceptance.    [To which the presiding judge answered, subject to exception by the defendant, "Yes, as to the letter but I find other facts."]

10. That, inasmuch as the offer is signed by Mack personally and is therefore ostensibly the offer of Mack and not of the defendant, in order to hold the defendant it must be established by the plaintiff not only that Mack in signing that offer was intending to act for the defendant, but that that offer was within the actual authority vested in him by the defendant.    [To this request the presiding judge said, subject to exception by the defendant, "Yes, but modified by inserting after 'actual' in the last line, 'or ostensible.'"]

11. That, it appearing in this case that the actual business of the defendant was in its own vessels and that it had never engaged in the business of chartering any but its own vessels and never had a tug of one thousand horse power, it was not within the power actually vested in Mack as general manager of the defendant to contract in behalf of the defendant for the furnishing of the tonnage specified in the offer.

12. That, it appearing in this case that the actual business of the defendant was in its own vessels and that it had never engaged in the business of chartering any but its own vessels and

never had a tug of one thousand horse power, it was not within any ostensible power of Mack to bind the defendant in the terms of his offer of September 26, 1899.

The presiding judge made a special finding as follows : " I find that the president of plaintiff company, before sending its letter of the 28th, notified Mr. Friend to accept the defendant's offer, and that by its letter intended to accept it, and that after Friend delivered his letter to Mack and before noon of that day, informed plaintiff's president that he had accepted Mack's offer in behalf of the plaintiff and that the president of plaintiff expressed his satisfaction and approval thereat," and found for the plaintiff.

The case then was referred to an assessor for assessment of damages, who made a report, on the filing of which the defendant moved for its recommitment before *Lawton*, J., who denied the motion, and the defendant excepted.

The material facts and the exceptions of the defendant with regard to the assessment of damages, as well as other material facts relating to the main issue, are stated in the opinion.

*A. C. Burnham*, for the defendant.

*R. M. Morse* (*C. E. Hellier* with him,) for the plaintiff.

LORING, J.  1.  The defendant's exceptions to the refusal of the judge to give the first and seventh rulings asked for by it must be overruled.

The judge was warranted in finding as a fact that the plaintiff intended to accept the written offer dated September 26, 1899, and signed " Wm. H. Mack, Manager." The evidence also warranted the judge in finding as a fact that, in addition to the unsuccessful attempt to accept it in writing, the plaintiff through its president verbally instructed the broker to accept it and ratified his action in accepting it when notified that he had done so. There is nothing inconsistent in the plaintiff's accepting a written offer both by word of mouth and in writing. And if it turns out that, through an unguarded expression in the writing, the writing is not, although it was intended to be, an acceptance, the oral acceptance which is not open to that objection is good. The difficulty with the defendant's argument here is that in it he assumes that, if there is an attempt to make a written acceptance of a written offer, the result is the same as it

is when the parties have reduced their agreement into a written contract. That assumption however is a mistake. When one attempts to accept in writing an offer made in writing there is no mutual agreement that certain specific written words shall stand as a statement of the trade ultimately struck between them. The question and the sole question is : Did the person to whom the offer was made accept it ? A dozen unsuccessful attempts to accept it do not affect the validity of one which is successful, at any rate where the intention in case of all the attempts was to accept it.

2. Again, the defendant's exception to the refusal of the judge to give the first, third and fourth rulings asked for by it must be overruled. The defendant's main contention in support of this exception is that the offer was to furnish a tug of one thousand horse power, and that the letter of Mr. Friend which is relied on as the acceptance of that offer is to hire a tug which will tow eight thousand tons of coal. As matter of construction of this letter, we do not think that that is so. Mr. Friend in his letter, speaking for the plaintiff, writes that the offer made is accepted. His statement of the offer is not altogether accurate. Construing the letter of acceptance as a whole, in connection with the written offer, we are of opinion that, as matter of construction, the tug referred to in Friend's letter of September 28 was to be a tug of one thousand horse power.

There is another discrepancy between the offer and the recital of it in Mr. Friend's letter of acceptance which is relied on by the defendant. We are of opinion that this also is disposed of by a proper construction of Mr. Friend's letter of acceptance. The offer states that the service is to begin "before Nov. 1st," while the recital of the offer in the letter of acceptance states that it is to be " from Nov. 1st or earlier."  " From Nov. 1st or earlier " is not the exact equivalent of " before Nov. 1st." But as matter of construction of Mr. Friend's letter which states that the offer is accepted we are of opinion that " from Nov. 1st or earlier " must be construed to mean " before Nov. 1st."

3. The defendant's exception to the refusal of the judge to give the first and sixth rulings asked for by it must be over-ruled. The defendant's contention in support of this ruling is that the only acceptance that Friend was authorized to convey

to the plaintiff was that contained in the letter of the defendant's president dated September 28. We have already pointed out that this is not true either in law or in fact, and this exception falls.

4. The defendant's exception to the refusal of the judge to give the second ruling asked for by it must be overruled.

The defendant's argument in support of this contention is that the plaintiff first learned of Mr. Friend's letter at the former trial, and that it was then too late for it to ratify that acceptance. But that is not so. There was testimony that the president of the plaintiff company was told by Friend before noon of September 28 (the day referred to in the postscript of the written offer dated September 26 as " Thursday noon ") that he had accepted the offer in behalf of the plaintiff, and that the president of the plaintiff expressed his satisfaction and approval at that time. There is nothing in this contention, and, as we have before said, there is nothing inconsistent in this connection between the position taken by the plaintiff at the first trial and that taken here.

5. The exception taken to the refusal of the judge to give the tenth, eleventh and twelfth rulings asked for by it must be overruled.

The presiding judge, acting upon the rule laid down in *Simonds* v. *Heard*, 23 Pick. 120, *Tucker Manuf. Co.* v. *Fairbanks*, 98 Mass. 101, *Davis* v. *England*, 141 Mass. 587, and *Brown* v. *Bradlee*, 156 Mass. 28, was warranted in finding that Mack in fact intended when he signed this letter to bind the defendant corporation; and we are of opinion that, if he did, and the contract was within his ostensible authority, the rulings asked for could not be given.

It is plain that the defendant would have been right in this connection if the presiding judge had given credit to all the statements testified to as having been made by Mack before his death. But it is manifest that the presiding judge did not believe the facts to be what it was testified that Mack stated them to be. The question is whether on any aspect of the evidence which the judge could have taken he could have found that when Mack signed the written offer dated September 26 " Wm. H. Mack, Manager," he intended to bind the defendant

corporation.   The first fact in this connection is that he was general manager of the defendant corporation, with an office in Boston, where the negotiations leading to the offer took place, and where the offer was made ; and that the only business carried on by him in Boston was as manager of the defendant corporation.   The defendant has sought to weaken the force of these facts by two pieces of testimony, namely : Mitchell in his testimony said " that he knew of his being engaged in the management of other vessels on the lakes," and Gilchrist testified " that he knew of the management by Mr. Mack on the Lakes in 1899 of the steamer ' Pratt ' and the consorts ' Athens,' the steamer ' George W. Roby,' and the steamer ' B. H. Ketchum,' which were owned by different companies."   In the first place the judge was not bound to believe this testimony; in the second place he was not bound to construe it as referring to September, 1899; and in the third place he was not bound to infer that " Wm. H. Mack, Manager," referred to these enterprises on the lakes.   The question before him really narrowed itself down to which of the two facts he was warranted in finding that " Wm. H. Mack, Manager," meant, viz. : manager of the defendant corporation, or manager of the vessels which he hoped to acquire to fulfil this contract on his own account when and if he got them. And it is to be remembered that the question we are now discussing did not arise until the presiding judge had come to the conclusion that he did not credit the defendant's testimony that the written offer of September 26, 1899, was conditional on his getting the necessary vessels, — a conclusion which it was hard to credit in the light of the postscript limiting the time during which the offer was to remain open to noon of the next day but one after the offer was made.   The use of the words " we will agree to furnish " in place of " I will agree to furnish," unless used inaccurately, means that the offer was not made by Mack personally, and consequently " Wm. H. Mack, Manager," did not mean manager of his own vessels when and if he secured them.   In addition the testimony of Gilchrist that Mack told him " that they had more business for their boats — they were tied up or had all they could do and had other business offered him that he could get if he had other boats to carry it," — might be construed by the judge to mean that the defendant corpora-

tion had more business, etc., and so to lend corroboration to the conclusion that by "Wm. H. Mack, Manager," the defendant corporation in fact was intended.

Again the fact that Mack in his despatch and letter to Boutell, who was vice-president of the company and owner of the tug Traveller, spoke of the tug Traveller and of the tug Smith in the same connection, and. particularly his statement that "You can talk with Capt. McCarthy and see what his idea is about having the tug down here in addition to the two belonging to the company," also lends, or might be so construed as to lend, some corroboration to the conclusion that he was trying to get the tug Traveller for the defendant corporation.

For these reasons we are of opinion that the evidence warranted a finding that "Wm. H. Mack, Manager," in fact meant the defendant corporation.

If "Wm. H. Mack, Manager," was intended to mean and in fact did mean the defendant corporation, it is plain that it binds the corporation, provided such a contract was within the ostensible authority of its general manager.

Further, we cannot doubt that such a contract is within the ostensible authority of the general manager and only officer conducting the business of a corporation engaged in carrying merchandise and particularly coal in barges towed by tugs without regard to the barges and tugs owned by the corporation, so that one contracting with such a company is not bound to ascertain that the company then owned the barges and tug which the company agrees to furnish.

6. The only other exception argued by the defendant is its exception to the refusal of the Superior Court to recommit the report of the assessor because the assessor refused to adopt the second ruling asked for by it at the hearing before him.

After a finding by the Superior Court that the offer set forth in the letter of September 26 was made by the defendant and accepted by the plaintiff, the case was sent to an assessor to find the amount of damages due. It appeared that the defendant repudiated the contract on October 7, 1899.

The assessor found that: "If there had been a number of barges and tugs to be had in the market at the time upon a time

charter similar to this, and if there was what might fairly be called a market rate for such charters on or about October 7, 1899, then the loss would be measured by the difference between what it would have cost the plaintiff to land its coal in Boston under the contract and what it would have cost under a charter made at the market rate on or about October 7, 1899. I find and report, however, that barges and a tug were not to be had on such a charter at the time the defendant gave notice that it should not perform its contract, nor afterwards up to May 1, 1900, at any price which could fairly be called a market price, or which the plaintiff could wisely or properly pay; nor were sailing vessels to be had on time charters of this sort at prices which it would have been proper or wise for the plaintiff to pay. . . . It is not credible that the plaintiff under the circumstances of this case should rely only on the breach of the defendant's contract and not use its best efforts to minimize the loss occasioned by that breach. I believe that it did so use its best efforts and that the course which it adopted was the reasonable and proper one. It chartered from time to time, according to its needs and on the best terms that could be got, vessels of various sizes and sorts, to bring its coal to Boston during the term covered by the contract."

The assessor next found what in fact it had cost the plaintiff per ton on an average to bring all the coal brought by it to Boston from Newport News during the term for which the contract was to run. He then found what it would have cost the plaintiff per ton to carry the coal which it would have carried under the contract on the same basis, to wit, on the basis of rates from Newport News. He then multiplied the number of tons of coal which the plaintiff could have carried under the contract by the difference between the two rates ascertained as above, and reported that to be the loss sustained by the plaintiff from the defendant's breach of its contract.

The contract was for a tug of one thousand horse power and four or five barges capable of carrying eight thousand tons of coal at $225 per day, beginning before November 1, 1899, and continuing until May 1, 1900. Under the findings of the assessor the plaintiff was forced to bring its coal by sailing vessels, and it appeared from the evidence that the rates of freight for coal

brought by sailing vessels was so much a ton. The coal which would have been brought under this contract was a part and apparently a somewhat small part of all the coal brought to Boston by the plaintiff during the period covered by the contract here in question.

The ruling now in question asked for by the defendant and refused by the assessor is as follows: "Second. The defendant requests the assessor to rule that the primary rule of damage is the difference between the cost of transporting the coal under the Mack contract and what it would have cost to have carried it by tonnage secured on October 7, 1899, or within such time thereafter as it could have been secured to cover the period of the contract; and the defendant objects and excepts to the assessor's refusal so to rule, and requests that the evidence bearing on said ruling be reported."

The argument of the defendant in this connection is that the plaintiff cannot be permitted to hold the defendant in damages for the difference between the price under the contract and the price at some later period fixed upon at his discretion as the period at which he will supply the deficiency.

Had there been a market rate for what the defendant had contracted to furnish, the defendant's argument would have been sound.

But not only was there no market rate on October 7, 1899, for a charter party covering a tug of one thousand horse power and barges to carry eight thousand tons of coal for the period in question, but these vessels could not be got at all.

The defendant in effect insists that under these circumstances it was bound to sit down on October 7, or as soon after that day as was reasonable, and estimate how much coal it would have brought to Boston under the contract, and make a contract for the transportation by sailing vessels of that amount of coal to fulfil the contract; and not having done so it can recover nominal damages only.

Without intimating what would be or might have been the rule had the coal to be carried under the contract been the only coal to be brought to Boston by the defendant, we are of opinion that having regard to the fact that the coal to be brought under the contract was but a part and apparently a small part of the

coal to be brought there by the plaintiff, this was not of necessity the only course open to it.

In the second place, the assessor was not bound as matter of law to find that a contract could have been made for the transportation by sailing vessels of the amount of coal which would have been carried under the contract.

There was some general testimony that rates for successive trips were lower than for single trips in the fall of 1899, and that sailing vessels were to be had at that time. If this evidence would have warranted a finding that such a contract could have been made, the assessor was not bound as matter of law to make that finding. The ruling asked for is absolute and not conditional on a finding that such a contract could have been made.

Finally, not only was the ruling asked for not conditional on a finding that such a contract could have been made, but it is not conditional on the making of that contract (if it could have been made), being the only reasonable course for the plaintiff to pursue.

The assessor in effect has found that the plaintiff, acting throughout in good faith, took a reasonable course to get all its coal transported to Boston at the lowest cost, and that the difference between what it in fact cost it (the plaintiff) to transport coal to Boston and what it would have cost it to transport coal under the contract in question had it been kept, could be found to be the measure of the damages suffered by the plaintiff from the breach of this contract under the circumstances which existed. We are of opinion that the assessor was not bound to adopt the rule laid down in the second request made by the defendant.

*Exceptions overruled.*