C. W. HUNT COMPANY *vs.* BOSTON ELEVATED RAILWAY
COMPANY.

BOSTON ELEVATED RAILWAY COMPANY *vs.* C. W. HUNT
COMPANY.

Suffolk.    December 9, 1907. — June 9, 1908.

Present: KNOWLTON, C. J., HAMMOND, LORING, BRALEY, & RUGG, JJ.

*Contract*, Construction, Performance and breach.  *Interest.  Damages.  Practice,
Civil,* Auditor.

In an action by a contractor against a street railway company, which was erecting
on a wharf a large pocket for the storage of coal to be brought to the wharf in
vessels, for a balance alleged to be due under a contract in writing to construct
for the defendant in accordance with certain specifications two hoisting towers
for hoisting coal from the vessels to the top of the pocket, it appeared that the
contract contained the following provision: " The contractor agrees that all
material furnished and work done hereunder shall be subject to acceptance by
the railway company and its vice president; that all apparatus furnished and
work done shall be subject at all times to the inspection of said vice president
or his authorized agents, and that any work performed or material furnished
which may be deemed by said vice president to be not in accordance with the
terms of this contract and accompanying specifications shall be immediately
replaced by the contractor at his own expense." The specifications provided
that the work should be executed under the direction and supervision of the
vice president of the railway company or his authorized representative, and
that the vice president, " without relieving the contractor from any responsibility
therein " reserved the right to direct the manner and order in which the work
should be executed.  The vice president executed the contract in behalf of the
defendant and the correspondence which took place under the contract was
conducted for the defendant by him.  *Held*, that the vice president represented
the defendant in the transaction and therefore was not in the position of a third
person named as an arbitrator; consequently that the work was to be done to
the satisfaction of the defendant, and, this being a business contract into which
matters of personal preference did not enter, that, if the towers as built by the
plaintiff were not satisfactory to the defendant's vice president, the plaintiff still
could recover the contract price on showing that the towers were so constructed
that they ought to have satisfied any reasonable man as a performance of the
contract.

In an action by a contractor against a street railway company, which was erecting
on a wharf a large pocket for the storage of coal to be brought to the wharf in
vessels, for a balance alleged to be due under a contract in writing to construct
for the plaintiff, by a certain date and in accordance with certain specifications,
two hoisting towers for hoisting coal from the vessels to the top of the pocket,
the contract required that the work should be done to the satisfaction of the
defendant and its vice president acting as its representative.  Six months after

the first tower and five and a half months after the second tower should have been completed and in working order, the defendant's vice president sent to the plaintiff a letter stating that " Up to this time there is no indication that these towers are likely to prove in any degree adequate or satisfactory," complaining that the plaintiff's men had left the work and ending as follows : " Unless you proceed without further delay to complete your contract we shall be compelled to install an efficient apparatus at your expense." In answer the plaintiff wrote a letter asking the defendant to point out any feature of the contract not carried out. This resulted in interviews and correspondence in which the disputed matters were discussed under fourteen heads, until on the third day of a month, a month and a half after the beginning of the correspondence, the defendant's vice president wrote to the plaintiff as follows : " I now have your letter of 2nd inst. and am pleased to note that you now wish to immediately proceed with the completion of the towers in accordance with my letter of the 24th ult. We supposed you would do so immediately on receipt of that letter, nor was there anything in your subsequent letter of the 27th ult. which appeared to be in conflict with the work proposed to be done. We were therefore at a loss to understand your telegram of 1st inst. So far from holding up the work, we have demanded and do demand that you proceed forthwith to complete your contract. You mention a desire that we should, in acknowledging your letter, state that the work can proceed to completion without interruption. We have no desire whatever to interrupt the work, but we waive none of our rights under the contract to reject any or all of it if it proves unsatisfactory when completed." *Held,* that the last sentence above quoted reserved the defendant's right to accept or reject the work done under the contract as modified by the interviews and correspondence, and that defects which had not been pointed out and insisted upon at the time the last letter was written were waived.

In an action by a street railway company, which was erecting on a wharf belonging to it a large pocket for the storage of coal to be brought to the wharf in vessels, for alleged breaches of a contract in writing to construct for the plaintiff, by a date named and in accordance with certain specifications, two hoisting towers for hoisting coal from the vessels to the top of the pocket, one of the specifications was as follows : " The contractor guarantees that the apparatus furnished by him shall be ample and suitable in design and construction to perform the work as hereinafter specified, and that it shall be free from all defects in workmanship or material. He also agrees to furnish free of charge to the railway company any part proving defective in the apparatus or any part thereof within two years after date of complete installation in working order of said apparatus." Within two years after the date of installation, while hearings in the case were being had before an auditor, a crack appeared in the frame of the engine of each tower. The auditor found that these cracks came, not from a faulty design, but from some fault in the casting and that they constituted " a serious defect." It seemed that the plaintiff continued to use the engines after the cracks appeared. The engines were not in any way affixed to the land. *Held,* that, if the defect gave the plaintiff a right to reject the engines altogether, which was not passed upon, such right had been waived by the plaintiff's continued use of the engines. *Held, also,* that the specification above quoted gave the plaintiff the right to elect whether, on the discovery of such a defect within two years, it would call for a new part or would claim damages, and that the right to call for a new part was not an exclusive remedy.

The rule of *Foote* v. *Blanchard,* 6 Allen, 221, that a purchaser of goods for cash payable on delivery in case of non-payment is chargeable with interest from the

date of delivery, is not applicable to an action on an account annexed containing forty-five items amounting to about $3,000, of which two items amounting to over $700 are for work done, three items amounting to more than $160 are for part of a bill of a person named, the nature of which does not appear, and sixteen items amounting to more than $50 are for freight. In such a case, if the plaintiff recovers, interest is due from the date of the writ only.

One who has been deprived of the use of his property contrary to the provisions of a contract, in suing for damages in an action of contract, is not precluded from recovering because the property in question commonly is not rented.

An auditor in assessing damages for a breach of contract is not bound to accept the testimony of an expert because it is the only evidence on the subject, but he is not justified in refusing to award any damages because he considers the estimate of the expert "obviously absurd." If he thinks the estimate too large, he can cut it down to the proper amount.

In an action by a street railway company, which was erecting on a wharf belonging to it a large pocket for the storage of coal to be brought to the wharf in vessels, for alleged breaches of a contract in writing to construct for the plaintiff, by a date named and in accordance with certain specifications, two hoisting towers for hoisting coal from the vessels to the top of the pocket, it appeared that one of the towers was not completed until more than nine months after it was required by the contract to be "completed and in working order" and that the other tower was not completed until about a month and a half later. Of these two periods of delay an auditor found that seven months in each case was the "inexcusable delay" of the defendant. It further appeared that during a portion of the period of delay there was a coal famine at the port in which the plaintiff's wharf was situated owing to a strike at the coal mines. The auditor did not find what portion of the period of delay was covered by the coal famine and the strike. The plaintiff had a power station at its wharf which used four thousand tons of coal a month, and had a storage capacity of three thousand tons, in addition to that of the coal pocket. The auditor found that the damages "were all attributable to the coal strike, which came without warning like a flood or tornado." He found and ruled that the damages suffered by the plaintiff were attributable to the coal strike and not to the failure of the defendant to perform its contract, and ruled that the plaintiff was not entitled to recover any damages. *Held,* that the ruling of the auditor that the plaintiff was entitled to no damages was wrong, and that the case must be recommitted to him for further hearing on the damages suffered by the plaintiff from the defendant's inexcusable delay of seven months; that the direct damage suffered by the plaintiff was the loss of the means of economical operation which the use of the towers would have furnished; that during the period of delay the plaintiff lost all return on the money previously paid by it in part payment for the towers, all use of its wharf and the adjoining dock and all use of its investment in the coal pocket and other structures erected by it for use in connection with the towers; that the expense of demurrage, which had to be paid to get coal loaded during that portion of the seven months while there was a strike or the effects of the strike lasted, might have been incurred reasonably by the plaintiff in discharging coal at another wharf, instead of discharging it at the plaintiff's wharf which had been rendered useless by the coal towers not being in working order through the inexcusable delay of the defendant; that the fact, that the delay was caused by a strike which came "like a flood or a tornado" in no way excused the defendant from paying the damages ensuing from his breach of contract; and that the fact that the price which the plaintiff had to

pay for the equivalent of its wharf during the time of the strike was exceedingly high because of the strike did not deprive the plaintiff of the right to recover it as damages.

Two ACTIONS OF CONTRACT for alleged breaches of the same agreement in writing printed below, brought against one another by the two corporations who were the parties to that contract. Writs in the Supreme Judicial Court dated respectively June 11 and July 8, 1904.

The C. W. Hunt Company declared in two counts, the first count to recover a balance of $5,450 and interest upon a contract by which the Boston Elevated Railway Company agreed to pay $25,000 for two 2-ton coal hoisting towers, of which it had paid $19,550, the second count to recover $58,141.91 and interest according to an account annexed, including the same items which went to make up the performance of the contract set up in the first count, and also numerous items for extras thereto, and items for articles supplied to the Boston Elevated Railway Company to replace articles broken or worn out by it in the use of the towers.

The Boston Elevated Railway Company declared in eight counts, the first count to recover demurrage alleged to have been paid because of delay by the C. W. Hunt Company in completing the contract, the second count for wharfage and dockage alleged to have been paid for the same reason, the third count to recover additional extra cost of discharging alleged to have been paid for the same reason, the fourth count to recover the same three things sought to be recovered by the first, second and third counts, the fifth count to recover money paid in settlement of personal injuries sustained by a workman while using the towers, the sixth count to recover back the $19,550 paid on account of the principal contract, the seventh count to recover incidental charges amounting to $38.65, and the eighth count to recover $443.74, paid on account of insurance.

During the spring and summer of the year 1892 the Boston Elevated Railway Company was erecting on Lincoln Wharf a large coal pocket for the storage of coal. The coal was to be brought to Lincoln Wharf in steamships or other vessels, hoisted out of the vessels to the top of the pocket by means of coal hoist-

ing towers, discharged into the pocket through hatches in the roof, and thence distributed to various power stations of the railway company.

On May 31, 1902, while the pocket was building and was nearing completion, the parties entered into the contract sued upon, which was as follows:

" This Agreement, by and between the C. W. Hunt Company, hereinafter called the contractor, — and the Boston Elevated Railway Company, hereinafter called the railway company, — both being corporations duly established by law;

" Witnesseth: That the parties to this agreement, each in consideration of the covenants and agreements on the part of the other herein contained, hereby covenant and agree, each for itself and its successors and assigns as follows:

" Section 1. The contractor agrees to furnish all labor, materials, tools and appliances and to construct in complete working order on tracks on top of the coal pocket at Lincoln Wharf, Boston, Mass. two (2), timber, steam and electrically operated, two-ton coal hoisting towers with all necessary machinery and equipment for the proper operation of the same, as per specifications of the railway company, signed by Robert B. Davis, designing engineer, dated May 1st, 1902, attached hereto and drawings referred to therein, both of which are made a part of this agreement, and to furnish the spare parts called for by said specifications.

" Section 2. The contractor agrees to begin work at the earliest possible moment, to carry the same on under the direction and to the satisfaction of the railway company, its vice-president and his authorized agents, to prosecute the same with all diligence and despatch to the earliest possible completion, and hereby agrees that one tower shall be completed and in working order on or before August 15th, 1902, and that the entire work shall be completed on or before September 1st, 1902, unless delayed by fire, strikes or unavoidable accident.

" Section 3. The contractor agrees that all material furnished and work done hereunder shall be subject to acceptance by the railway company and its vice president; that all apparatus furnished and work done shall be subject at all times to the inspection of said vice president or his authorized

agents, and that any work performed or material furnished which may be deemed by said vice president to be not in accordance with the terms of this contract and accompanying specifications shall be immediately replaced by the contractor at its own expense.

" Section 4.  The contractor agrees to assume all responsibi'ity for accident or damage to person or property, including any accident or damage to its agents or employes, or to its apparatus, materials or work, in any way growing out of said work or incident thereto, and hereby covenants and agrees to indemnify and save harmless said railway company from and against any and all claims, suits or demands whatsoever arising therefrom, from any liens whatsoever or from non-compliance with regulations made by legal authorities.

" Section 5.  Said contractor guarantees to the railway company the right to own, use, repair, or replace all parts and devices attached by it in building, furnishing and erecting said construction, and hereby agrees to protect and save harmless the said railway company from and against all claims or suits under any patents whatsoever in regard to said construction or any part thereof.

" Section 6.  In consideration of the foregoing agreement the railway company agrees to pay unto the contractor or its legal representative, the sum of twenty-five thousand (25,000) Dollars, payment to be made as follows:

" On the tenth day of each month a sum, which added to previous payments, shall amount to eighty-five (85) per cent of the value of the materials furnished and work performed on the first day of said month, — which shall be estimated by the representative of the railway company, — the balance of the contract price to be paid thirty (30) days after the machinery is in successful operation.

" Section 7.  It is further understood and agreed that all provisions in the specifications hereto attached are to be deemed a part hereof with the same force and effect as if expressly rewritten and inserted herein.

" In Witness Whereof, the contractor has hereunto set its hand and seal, and the railway company has caused this agreement to be executed by its vice president, Charles S. Sergeant,

and its corporate seal to be hereto affixed, on this thirty-first day of May, A. D. 1902.

"C. W. Hunt Company,
By C. W. Hunt, Prest.

"Form approved: G. C. T.
"Boston Elevated Railway Company,
By Charles S. Sergeant, Vice President."

Here followed specifications, some of which are mentioned in the opinion.

The cases were referred to R. D. Weston-Smith, Esquire, as auditor, with an agreement of the parties that his findings of fact were to be final. The facts found by the auditor are stated and described in the opinion.

He found that the C. W. Hunt Company was entitled to recover in the first action, under the first count of its declaration, $5,450, with interest from February 16, 1904, and under the second count of its declaration, $4,495.87, with interest on each item composing this last total from its date. He found that the railway company was entitled to recover in the second action, under the seventh count of its declaration, $34.14, together with interest on each item composing this total from the date set against it in the account which forms a part of the seventh count of the railway company's declaration, and under the eighth count of its declaration, $250, together with interest on $150 of this amount from September 9, 1902, and on $100 from October 31, 1902. He found that the railway company was not entitled to any of the damages claimed on account of delay or to the sum paid in settlement of personal injuries resulting from a certain accident.

The cases came on to be heard before *Rugg*, J., on motions of the Boston Elevated Railway Company to recommit them to the auditor and on its requests for rulings, and on motions of the C. W. Hunt Company to enter judgment on the auditor's report. With the agreement of the parties, the justice reserved the cases for determination by the full court, such disposition to be made of them as justice might require.

*E. F. McClennen,* for the C. W. Hunt Company.

*A. P. Stone,* for the Boston Elevated Railway Company.

Loring, J.  1.  We are of opinion that the auditor was right in proceeding on the footing that the Hunt Company was entitled to recover if " the towers did conform to the contract and specifications, as modified by the parties in March, 1903, and that if they were not satisfactory to the vice-president of the railway company they ought to have satisfied a reasonable man."

This is not a contract " into which considerations of taste or personal preference may enter," as was said by Knowlton, C. J., in *Noyes* v. *Eastern Accident Association*, 190 Mass. 171, 172. That is to say, it is not a case within *McCarren* v. *McNulty*, 7 Gray, 139; *Brown* v. *Foster*, 113 Mass. 136; *White* v. *Randall*, 153 Mass. 394; *Webber* v. *Cambridgeport Savings Bank*, 186 Mass. 314, 315. The case at bar is for work of a business character and comes within *Hawkins* v. *Graham*, 149 Mass. 284, if as matter of construction it was to be done to the satisfaction of the defendant and not to that of a third person as arbitrator.

The provision of the contract is: " The contractor agrees that all material furnished and work done hereunder shall be subject to acceptance by the railway company and its vice president; that all apparatus furnished and work done shall be subject at all times to the inspection of said vice president or his authorized agents, and that any work performed or material furnished which may be deemed by said vice president to be not in accordance with the terms of this contract and accompanying specifications shall be immediately replaced by the contractor at its own expense." There are also these provisions in the specifications: " The work shall be executed under the direction and supervision of the vice-president of the Boston Elevated Railway Company or his authorized representative. . . . The vice-president of the Boston Elevated Railway Company, without relieving the contractor from any responsibility therein, reserves the right to direct the manner and order in which the work shall be executed."

Had Mr. Sergeant been a third person and not an officer of the defendant corporation, the provisions of the specifications would have been enough to make him a *quasi* arbitrator within the rule applied in *Atkins* v. *Barnstable*, 97 Mass. 428; *Palmer* v. *Clark*, 106 Mass. 373; *Flint* v. *Gibson*, 106 Mass. 391;

*Robbins* v. *Clark*, 129 Mass. 145; *National Contracting Co.* v. *Commonwealth*, 183 Mass. 89 ; *Norcross* v. *Wyman*, 187 Mass. 25.

But Mr. Sergeant represented the railway company in this transaction, and was not a third person. That being so, the provision that the work was to be done "subject to acceptance by the railway company and its vice president" would have brought this case within *Hawkins* v. *Graham* without a doubt had that been the only provision of the contract on this point. In such a case Mr. Sergeant in accepting or not accepting the work would have acted for and represented the railway company, and would not have been a third person acting as arbitrator.

Although, as we have said, the provisions in the specifications look the other way, we are of opinion on the whole that Mr. Sergeant must be taken to have been the representative of the defendant and not a third person in this matter. This conclusion is enforced by the fact that all the correspondence set forth in the report which took place under the contract was carried on by Mr. Sergeant in behalf of the railway company.

2. The railway company urges that the auditor is wrong in his conclusion from the correspondence set out in the report "that if the changes specified were made, and if they accomplished the results which they might fairly be expected to accomplish, the railway company would be satisfied with the towers and would accept them."

This contention of the railway company is based on these words in the closing letter of April 3: "We have no desire whatever to interrupt the work, but we waive none of our rights under the contract to reject any or all of it if it proves unsatisfactory when completed." This statement is to be taken in connection with what went before.

On February 19, 1903, (that is to say, six months after the first tower and five and a half months after the second tower should have been completed and in working order,) Mr. Sergeant wrote to the Hunt Company a letter stating that "up to this time there is no indication that these towers are likely to prove in any degree adequate or satisfactory," complaining that the Hunt Company's men had left the work, and ending with this threat: "Unless you proceed without further delay to com-

plete your contract we shall be compelled to install an efficient apparatus at your expense." In answer the president of the Hunt Company wrote a letter of explanation ending with this request: "If you will kindly point out any feature of the contract which has not been carried out by us, I would be pleased to have you advise me of the same, and it will be given immediate and careful attention, and meanwhile we say, courteously but emphatically, that we deny your right ' to install an efficient apparatus at your (our) expense' or any apparatus at our expense, and in the same way we repudiate the suggestion contained in your letter, that the machinery is not in accordance with our contract, or in any wise inefficient through any fault of ours." Thereupon a personal interview took place on March 3, 4 and 5, in which Mr. Sergeant undertook to tell the representative of the Hunt Company "in what respects the towers failed to meet the requirements of the railway company." These were embodied in a letter from Mr. Hunt, dated March 17, under six heads, and stated that "Each of the other points noted in the conference we are now in the process of making such changes in, as we have no doubt will meet your approval." Another conference took place on March 19 and 20, and the points discussed were embodied in a letter of Mr. Hunt dated March 23, under fourteen heads. In this letter Mr. Hunt states what he proposes to do in respect to each of the fourteen matters. On the 24th Mr. Sergeant discusses each of the fourteen heads and what the Hunt Company proposes as to each, and on the 27th Mr. Hunt answers, dealing with the fourteen items in a similar way. Then follows a correspondence not set out in the report but which is characterized by the auditor as "some rather lively correspondence . . . as to who was now causing delay"; and on April 3 this is closed by a letter from Mr. Sergeant in which he states that he is "pleased to note that you now wish to immediately proceed with the completion of the towers in accordance with my letter of the 24th ult. We supposed you would do so immediately on receipt of that letter, nor was there anything in your subsequent letter of the 27th ult. which appeared to be in conflict with the work proposed to be done. We were therefore at a loss to understand your telegram of 1st inst. So far from holding up the work, we have de-

manded and do demand that you proceed forthwith to complete
your contract." Then follows the paragraph here relied on by
the railway company, which we repeat in full: "You mention a
desire that we should, in acknowledging your letter, state that
the work can proceed to completion without interruption. We
have no desire whatever to interrupt the work, but we waive
none of our rights under the contract to reject any or all of it if
it proves unsatisfactory when completed." We agree with the
auditor that this closing paragraph reserves the railway com-
pany's right to accept or reject the work done under the con-
tract as modified by these interviews and this correspondence,
and that defects not then pointed out and insisted upon were
waived.

3. We find no error with the way in which the auditor dealt
with the provision of the contract that "the towers may be
operated by two men or one man as may be preferred," and the
contention of the railway company "that the boom does not
swing in a horizontal plane sufficiently to make its swinging of
any practical value." The first of these two matters is disposed
of by the auditor in these words: "If this was a difficulty, I
find that it was one which was apparent in March, 1903." And
the second was as follows: "If this was a defect, I find that it
too was apparent in March, 1903. And I find that so far as
these two objections to the towers are concerned, they were
waived by the railway company by virtue of the conferences and
correspondence above referred to — not expressly, but by neces-
sary implication."

4. During the hearings before the auditor a crack appeared
in the upper part of the left hand frame of each engine. The
counsel for the railway company assumed in his argument that
these cracks appeared there for the first time, not that they ex-
isted before but were discovered then, as the auditor in one
part of his report seems to imply. We shall treat the fact on
the footing assumed by the railway company's counsel. The
auditor found that these cracks came not from a faulty design,
but from some fault in the casting, and that they "constitute a
serious defect." The railway company contends "that this jus-
tified the rejection of the towers and [that] the contract has
never been fulfilled." Under this finding the frames of the en-

gines did not meet the requirements of clause 1 of Section 6 *
of the specifications, nor the requirements of Section 3 † of the
contract, as that section has been construed by us.   If this de-
fect gave the railway company a right to reject the engines alto-
gether (which we do not intimate) that right has been waived by
the continued use of them by the railway company.   It is to
be noted that these engines are not in any way affixed to the
land.

On the other hand we are of opinion that the auditor was
wrong in the way he dealt with the railway company's claim
for damages by reason of these cracks.   He disposed of the
matter in these words: "These two parts of the apparatus
proved defective within two years after the date of completion,
and by the terms of section 6 of the specifications the Hunt
Company is bound to furnish new side-frames free from flaws
and of suitable strength.   On my findings, therefore, these
cracks pass out of the case as an element of damage."

Had the first clause of Section 6 of the specifications which
we have just set forth stood alone, the damages for a breach of
it caused by a defect in the casting, would have included not
only furnishing new frames but also the expense of taking off
the old frames and putting on new ones, together with the loss
caused by the towers being out of commission while these re-
pairs were being made.   And the same damages would have
been due under Section 3 of the contract.   The auditor's ruling
is in effect a ruling that these two provisions (to wit, clause 1

---

* "Section 6.  The contractor guarantees that the apparatus furnished
by him shall be ample and suitable in design and construction to perform
the work as hereinafter specified, and that it shall be free from all defects in
workmanship or material.

"He also agrees to furnish free of charge to the railway company any
part proving defective in the apparatus or any part thereof within two years
after date of complete installation in working order of said apparatus."

† "Section 3.  The contractor agrees that all ·material furnished and
work done hereunder shall be subject to acceptance by the railway company
and its vice president; that all apparatus furnished and work done shall be
subject at all times to the inspection of said vice president or his authorized
agents, and that any work performed or material furnished which may be
deemed by said vice president to be not in accordance with the terms of
this contract and accompanying specifications shall be immediately replaced
by the contractor at its own expense."

of Section 6 of the specifications, and Section 3 of the contract) are limited and controlled by the second clause of Section 6 of the specifications. In that we do not think that he was right. The second clause of Section 6 is not introduced by the words: "provided, however," or by similar words. It begins with the words "He also agrees." That is to say, it is an agreement in addition to that contained in clause 1 of Section 6, not one qualifying it.

The result of the two clauses is that in case of a defect in the material of any part of the apparatus (discovered within two years) the railway company had a right to elect to claim damages or to call for a new part.

The case must be recommitted to the auditor for further hearing on the amount of these damages.

5. We find no error in the finding of the auditor as to the allowance of extras* allowed by him, except in the matter of interest. The auditor has allowed interest on each item from the date when it was finished. The Hunt Company now attempts to support that ruling on the authority of *Foote* v. *Blanchard*, 6 Allen, 221, and similar cases in which it is held that interest runs on a sale for cash from delivery of the goods sold. But of the forty-five items here in question (amounting to $3,042.61), two (amounting to $718.60) are for work done, three (amount-

---

* "The extras for which I rule that the Hunt Company is entitled to recover are such as were supplied to take the place of parts of the machinery broken through the negligence or inexperience of the railway company's employees, or to take the place of parts of the apparatus which were worn out in the operation of the towers by the railway company. Many of these things were furnished before the towers were completed or ready to turn over, but they cannot be regarded as alterations or additions of materials or labor within the meaning of specifications, sec. 36, which the vice-president might order, and which, if ordered, were to be ordered by him in writing. They were outside the contract altogether. The railway company undertook to operate the towers before they were completed, for its own advantage as well as for the advantage of the Hunt Company, and extras of the kind I describe should be paid for just as much as if the towers had been turned over completed at the time when the railway company's engineers began to operate them. Parts of the apparatus ordered by the railway company after the towers were completed, to supply the places of broken or worn out parts, or apparatus ordered by it which was outside of the contract, must, of course, be allowed for."

ing to $168.33) are for part of a bill of a person named, the nature of which is not shown, and sixteen (amounting to $53.49) are for freight.  It is manifest that the items do not come within the rule of *Foote* v. *Blanchard.*  Interest is due here from the date of the writ only.

6.  Lastly, we are of opinion that there was a mistrial in the matter of damages suffered by the railway company from delay in the completion of the towers.

By the terms of the contract the two towers should have been "completed and in working order " one on or before August 15, 1902, and the other on or before September 1, 1902.  By the finding of the auditor they were completed on May 25, 1903, and July 21, 1903, respectively.  That is to say, there was a delay of nine months and ten days in case of the first, and a delay of ten months and twenty-one days in case of the second tower.  Of these two periods of delay the auditor found that seven months in each case was the "inexcusable delay " of the Hunt Company.

For this delay the auditor finds that the railway company is not entitled to recoupment in the action brought against it for the contract price, nor to any recovery in the cross action.

It appeared on the evidence that during some portion of the whole period of delay, namely, from August 15, 1902, to July 21, 1903, there was a coal famine in Boston owing to a strike at the coal mines.  What portion of that period was covered by the coal famine and strike is not found by the auditor.

The railway company introduced evidence that under ordinary circumstances the value of each tower was $25 a day, or at least six cents a ton, and that during the period of delay it paid out money in demurrage, dockage and similar expenses.

The claim for damages under ordinary circumstances, that is to say, before the effect of the strike was felt in Boston and after it ceased, is dealt with by the auditor in these terms:  "So far as the damages which might be allowed [in recoupment] in the first case are concerned, it was contended that the fair rental value of the property to the defendant might be allowed, and the only evidence as to what this might be was the evidence of one expert produced by the railway company who said that the value of such towers was $25 a day for each tower.  This would

amount to about $15,000 a year, and it is obviously absurd. No evidence was introduced which enables me to find what their fair rental value by the month or by the year really was, and I am of the opinion that the fair rental value is not a proper measure of damages anyway, for the towers were not intended to be rented and are not commonly rented in this port. . . . The period of delay overlaps to some extent the time when the strike was over and normal conditions were restored. As to this period the true measure of damages might have been the difference in the cost to the railway company of delivering the coal at the central and other stations accessible to domestic vessels and then distributing it so far as might be necessary from those points, and the cost of discharging it at Lincoln Wharf and distributing it from there. But no evidence was introduced before me as to what the comparative cost of these two methods of discharge and distribution was."

The claim for damages during the period affected by the strike is dealt with as follows: " So far as all the damages are concerned which the railway company undertook to prove under the first four counts of its declaration in the second case, I find that they were all attributable to the coal strike, which came without warning, like a flood or tornado. . . . A number of vessels were in the harbor simultaneously so that even those which were small enough to go into the Lincoln Wharf dock could not all have been discharged there. It is, of course, true that if the towers had been running then as they are running to-day considerable quantities of coal could have been discharged into the Lincoln Wharf pocket and distributed from that point, and this method of discharging the vessels would have saved the railway company a considerable amount of money. But the damages which it suffered I find and rule were attributable to the coal strike, and not to the failure of the Hunt Company to perform its contract, and I rule that the railway company is not entitled to recover any damages in the second case."

The conclusion reached by the auditor on both claims was as we have before said that " the railway company is not entitled to recover any damages whatever."

We are of opinion that the auditor was wrong in the way he dealt with both periods.

Dealing first with the period when normal conditions prevailed:

Upon this branch of the case the main ground on which the auditor went (as we understand his report) is that no damages were due because coal towers "are not commonly rented in this port."

A man who has been deprived of his property is not precluded from recovering therefor because the property in question is not "commonly rented." That point is covered by *Weston* v. *Boston & Maine Railroad*, 190 Mass. 298.

The case of *Weston* v. *Boston & Maine Railroad* is different from the case at bar in this: In *Weston* v. *Boston & Maine Railroad* the goods to be transported were so essential to the business of the plaintiff that without them the business came to an end and the loss was measured by the profits ordinarily made. The two towers on Lincoln Wharf were not so essential to the business of the railway company that its business was stopped by the Hunt Company's failure to furnish them as they had contracted to do. The direct damage suffered by the railway company in the case at bar was the loss of economical operation which would have been furnished by the use of these towers. See in this connection, for example, *Abbott* v. *Hapgood*, 150 Mass. 248.

Direct evidence on that point was introduced by the railway company. One part of this evidence is dealt with by the auditor in these words: "The only evidence as to what this might be was the evidence of one expert produced by the railway company who said that the value of such towers was $25 a day for each tower. This would amount to about $15,000 a year, and it is obviously absurd."

The auditor was not bound to accept the testimony of the expert because it was the "only evidence." See *Lindenbaum* v. *New York, New Haven, & Hartford Railroad*, 197 Mass. 314, and cases there cited.

On the other hand if the auditor knew enough about the subject in question to reject the evidence of this expert as putting the value too high, it is hard to see why he did not cut it down to the proper amount. And it is certainly a *non sequitur* to come to the conclusion that no damages were due.

The auditor in this connection went on and stated the difficulty of arriving at a satisfactory result on this matter owing to the fact that the towers had been operated by the railway company to some extent before they were completed, that the railway company's engineers were inexperienced, and that extraordinary difficulty was encountered in handling English coal which the railway company had bought. He ends this part of his report with the statement that " any finding on that point [would be] the wildest sort of guess." In this connection what was said by Lord Halsbury in *The Mediana*, [1900] A. C. 113, 116, is very pertinent: " Of course the whole region of inquiry into damages is one of extreme difficulty. You very often cannot even lay down any principle upon which you can give damages; nevertheless it is remitted to the jury, or those who stand in place of the jury, to consider what compensation in money shall be given for what is a wrongful act. Take the most familiar and ordinary case: how is anybody to measure pain and suffering in moneys counted? Nobody can suggest that you can by arithmetical calculation establish what is the exact amount of money which would represent such a thing as the pain and suffering which a person has undergone by reason of an accident."

But even if the auditor was right in his conclusion that on the evidence before him the value of the use of these two towers when ordinary conditions prevailed could not be measured in money, he was wrong in his conclusion that no damages were due here.

It was held in *The Greta Holme*, [1897] A. C. 596, and in *The Mediana*, [1900] A. C. 113, that when a person is deprived of property he is entitled to substantial damages, even although the property in question did not yield an income to the owner.

In *The Greta Holme* a dredger owned by the Mersey Docks and Harbour Board was injured by collision with the Greta Holme, for which the latter was alone to blame, and was laid off for fifteen weeks for repairs. The Mersey Docks and Harbour Board was a public body charged with the duty (*inter alia*) of keeping the harbor of Liverpool from filling up with silt. Its funds are derived from rates levied upon those using the undertaking. It was held that this board was entitled to substantial damages for loss of the use of the dredger during these

fifteen weeks.   This decision was followed by that in *The Mediana*, [1900] A. C. 113, where the lightship Comet, owned by the same Mersey Docks and Harbour Board, was run into by the Mediana and thereby laid off for seventy-four days.   During these seventy-four days a spare lightship, kept by the board for the purpose, took the Comet's place, and it was again contended that the owners of the Comet could not recover damages for being deprived of the Comet for these seventy-four days.   In delivering judgment in the latter case Earl Halsbury, L. C., said: " What right has a wrongdoer to consider what use you are going to make of your vessel?   More than one case has been put to illustrate this : for example, the owner of a horse or of a chair.   Supposing a person took away a chair out of my room and kept it for twelve months, could anybody say you had a right to diminish the damages by showing that I did not usually sit in that chair, or that there were plenty of other chairs in the room?   The proposition so nakedly stated appears to me absurd."

Both these cases are cases of tort, and would not necessarily determine the question before us if the only claim to damages which the railway company have here was for loss in economical operation from not having a machine when by the terms of a contract it was entitled to it.   For the moment we are assuming that no such loss was proved in the case at bar.   But it is apparent that that was not the only loss which the railway company suffered here.   So long as these towers were in process of construction after the time for their completion had expired, it would seem that the railway company must have lost (1) all return on the money previously paid by it in part payment for the towers, (2) all use of Lincoln Wharf as a wharf, (3) all use of Lincoln Wharf dock as a dock, and (4) all use of its investment in the coal pocket and other structures erected by the railway company in connection with the towers.   So long as the Hunt Company was at work on the towers after the time for completion of them had passed, the railway company was thereby deprived of all return from its investment in these four items of property, and to that extent the decisions in the Greta Holme and the Mediana are applicable.

There is one other matter that should be noticed in this con-

nection, namely, the loss incurred by the railway company in the economical handling of the coal to be used at the Lincoln Wharf power station.    The Lincoln Wharf power station uses four thousand tons a month, and has a storage capacity in the station (in addition to that of the coal pocket on the wharf) of three thousand tons.    It is unbelievable that it is as economical to unload coal at a hired wharf, or at another wharf of the railway company, carry it to Lincoln Wharf, and then elevate it into the storage room of that plant as it would be to discharge it directly into that storage room from the hold of the coal vessel by means of these towers.

At the new trial there may be more evidence bearing directly on the value of the use of the towers, and on all these matters, and it would serve no useful purpose to discuss them further now.

It is proper to add that we have found nothing in the thirty cases cited *en masse* on this part of the case by the Hunt Company,* in conflict with the conclusion to which we have come.

This brings us to the period when the conditions in Boston Harbor were affected by the coal strike and demurrage and dockage had to be and were paid by the railway company.

In the first place, if the auditor had been right in ruling that there could be no circumstances under which the railway com-

---

* The cases in the brief of the C. W. Hunt Company referred to above were as follows : *Denney* v. *New York Central Railroad*, 13 Gray, 481. *Hoadley* v. *Northern Transportation Co.* 115 Mass. 304.    *Fox* v. *Boston & Maine Railroad*, 148 Mass. 220.    *Swift River Co.* v. *Fitchburg Railroad*, 169 Mass. 326.    *Waite* v. *Gilbert*, 10 Cush. 177.    *Wagner* v. *Corkhill*, 40 Barb. 175.    *Allis* v. *McLean*, 48 Mich. 428.    *Central Trust Co.* v. *Arctic Ice Co.* 77 Md. 202.    *The Henry Buck Co.* 39 Fed. Rep. 211.    *De Ford* v. *Maryland Steel Co.* 113 Fed. Rep. 72.    *Bridges* v. *Stickney*, 38 Maine, 361. *Fox* v. *Harding*, 7 Cush. 516.    *Hadley* v. *Baxendale*, 9 Exch. 341.    *British Columbia Saw Mill Co.* v. *Nettleship*, L. R. 3 C. P. 499.    *Merrimack* v. *Quintard*, 107 Mass. 127.    *Harvey* v. *Connecticut Co.* 124 Mass. 421.    *Clark* v. *Moore*, 3 Mich. 55.    *Willey* v. *Fredericks*, 10 Gray, 357.    *Taylor* v. *McGuire*, 12 Mo. 313.    *Mather* v. *American Express Co.* 138 Mass. 55.    *Johnston* v. *Faxon,* 172 Mass. 466.    *Edgar* v. *Breck & Sons*, 172 Mass. 581.    *Manning* v. *Fitch*, 138 Mass. 273.    *Florence Machine Co.* v. *Daggett*, 135 Mass. 582. *Spiers* v. *Union Drop Forge Co.* 180 Mass. 87.    *Abbott* v. *Hapgood*, 150 Mass. 248.    *Lonergan* v. *Waldo*, 179 Mass. 135.    *Watson* v. *Needham*, 161 Mass. 404.    *White* v. *Moseley*, 8 Pick. 356.    *Whitehead & Atherton Machine Co.* v. *Ryder*, 139 Mass. 366.

pany could recover sums paid for demurrage and dockage during the time of the strike, it would not have followed that nothing in the way of damages could be recovered by it during this period.   If it could not recover the extraordinary damages which it in fact suffered, it could recover ordinary damages not exceeding in amount the extraordinary damages suffered by it in fact.   *Cory* v. *Thames Iron Works Co.* L. R. 3 Q. B. 181.

But we are of opinion that the auditor was wrong in ruling that under no circumstances could sums paid for demurrage and dockage be recovered.

During the time the strike lasted, including the time when conditions in Boston Harbor were affected by it (or at any rate during a part of this time) the Hunt Company was in default in not furnishing the railroad company with the two towers called for by the contract for unloading coal at the railway company's wharf known as Lincoln Wharf.

Under these circumstances the railway company had a right to procure in any reasonable and proper way, at the expense of the Hunt Company, what the Hunt Company had agreed to furnish and had not furnished to it, and all sums so expended could be recovered as the damage suffered by it.

No rule of damages is better settled.   It was applied in *Johnson* v. *Arnold*, 2 Cush. 46 ; *Waite* v. *Gilbert*, 10 Cush. 177 ; *Brown* v. *Smith*, 12 Cush. 366 ; *Mather* v. *American Express Co.* 138 Mass. 55 ; *Whitehead & Atherton Machine Co.* v. *Ryder*, 139 Mass. 366 ; *Peak* v. *Frost*, 162 Mass. 298 ; *Swift River Co.* v. *Fitchburg Railroad*, 169 Mass. 326 ; *Weston* v. *Boston & Maine Railroad*, 190 Mass. 298, 299, 300 ; *Metropolitan Coal Co.* v. *Boutell Transportation & Towing Co.* 196 Mass. 72.   And in other jurisdictions see *Hamlin* v. *Great Northern Railway*, 1 H. & N. 408; Blackburn, J., in *Hinde* v. *Liddell*, L. R. 10 Q. B. 265, 268; *Featherston* v. *Wilkinson*, L. R. 8 Ex. 122.

It goes without saying that the two towers here in question, in connection with the Lincoln Wharf power plant and coal pocket of the railway company on that wharf had no duplicate, and for that reason the exact facilities called for by the contract could not have been obtained by the railway company.   For example, two towers could not be obtained which would discharge coal directly into the Lincoln Wharf power plant for use in that

station. That station (as we have said) used four thousand tons a month and had a storage capacity of three thousand tons apart from the storage capacity of the coal pocket on the wharf.

But when the exact thing called for by the contract cannot be obtained by the party to whom performance is due, that party can procure at the expense of the one in default what under all the circumstances reasonably amounts to the next best thing. For example, if a railroad fails to carry a passenger to his destination he can under ordinary circumstances take a carriage at the railroad's expense. *Hamlin* v. *Great Northern Railway*, 1 H. & N. 408. *Hinde* v. *Liddell*, L. R. 10 Q. B. 268. This was conceded by the parties in *Sears* v. *Eastern Railroad*, 14 Allen, 433. In the recent case of *Metropolitan Coal Co.* v. *Boutell Transportation & Towing Co.* 196 Mass. 72, the defendant had contracted to provide the plaintiff with a tug and barges for the transportation of coal, and it failed to do so. The plaintiff not being able to hire another tug with the accompanying barges, brought its coal in sailing vessels. The difference between the cost of bringing the coal in sailing vessels and the price to be paid for the tug and barges was held to be a proper measure of damages.

It being impossible to procure exactly what the contract here in question called for, the railway company had the right to get (at the Hunt Company's expense) as nearly as it could what it would have had if the towers had been in working order. It could have hired another wharf, unloaded its coal vessels there, carried to Lincoln Wharf the coal to be used at that power station, and distributed from this hired wharf what would have been unloaded at the Lincoln Wharf coal pocket for distribution. Having done so, it could have recovered from the Hunt Company (1) the difference between the expense of unloading the coal for the Lincoln Wharf plant directly into that building and unloading it at the hired wharf, carting it from there to Lincoln Wharf and putting it in the storage room of that station; and (2) the difference in expense, if any, between unloading at the hired wharf and distributing it from that point, the coal to be distributed among other stations, and the expense of doing the same work at Lincoln Wharf using the two towers in question, plus the loss from the Lincoln Wharf plant lying idle. And if

wharves were not to be had (as would seem to have been the case at this time), and the railway company could discharge a vessel at one of its other wharves without interfering with other vessels which were to be discharged there, it would be proper for it to do so.

Further, if demurrage had to be paid for vessels which could have been discharged at Lincoln Wharf while they were waiting to discharge at wharves hired by the defendant or at other wharves owned by the railway company, that might well be an expense reasonably incurred in procuring as nearly as possible what it (the railway company) would have had, if the contract had been fulfilled.

The railway company could not procure a vessel of coal by ringing a bell or turning on a faucet. During and after a coal strike, coal has to be bought when and where it can be obtained, ships have to be secured when they can be chartered, and finally, the rule of a port is first come first served, and the result is that ships have to take their turn and wait for an opportunity to discharge. Under such circumstances the payment of demurrage may well be an expense reasonably incurred in discharging at another wharf in place of discharging at the wharf which was rendered useless by the coal towers not being in working order through the "inexcusable delay" of the contractor.

What we have said is not to be taken as exhausting the matter under consideration, but as showing some of the circumstances under which demurrage, dockage and similar expenses might be allowed as money expended in securing what the railway company was entitled to have during the seven months here in question of "inexcusable delay" on the part of the Hunt Company.

We assume that the ruling of the auditor here in question was made on the authority of such cases as *Denny* v. *New York Central Railroad*, 13 Gray, 481, *Hoadley* v. *Northern Transportation Co.* 115 Mass. 304, and perhaps *The Henry Buck*, 39 Fed. Rep. 211, cited by the defendant; but in those cases there was no question of expending money to secure what was due under the contract. The fact that demurrage had to be paid to get coal landed during that portion of the seven months during which there was a strike or while the effects of the strike lasted, in the case at bar, was because there were vessels waiting to be dis-

charged which arrived before the vessels which brought the railway company's coal. The fact that this was caused by a strike which, in the language of the auditor, came "like a flood or a tornado" was of no consequence. The price which had to be paid for the equivalent of Lincoln Wharf during the seven months in which there was a strike, was exceedingly high, and the reason why it was exceedingly high was doubtless because of the coal strike. But the cause of the high price was of no consequence. Where one party to a contract can buy or sell at the expense of the other, that other has to stand the change in price, no matter what the cause of it is. If, for example, a plaintiff in buying wheat or corn at the defendant's expense, to secure what the defendant contracted the plaintiff should have, should pay a higher than the ordinary price, it is of no consequence that the reason why the price of wheat or corn had gone up was because of a flood or of a tornado which destroyed a large part of the crop.

The result is that the case must be recommitted to the auditor (1) to correct the allowance of interest before the date of the writ on the sums due for extras, (2) for further hearing on the damages suffered by the railway company from the cracks in the frames of the engines, and (3) for further hearing on the damages suffered by the railway company from the Hunt Company's inexcusable delay of seven months.

*So ordered.*